IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | | |
|---|---|---|
| **HABIB GHARIB,** | * | |
| Plaintiff, | * | Case No.: GJH-17-3476 |
| v. | * | |
| **THE JOURNAL OF THE COMMITTEE ON THE POLITCAL ECONOMY OF THE GOOD SOCIETY,** *et al.,* | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Habib Gharib brings this action against Defendants The Journal of the Committee on the Political Economy of the Good Society ("the Journal"), the University of Maryland ("UMD" or "University"), Stephen Elkin, and Joshua Miller (collectively, "Defendants"), alleging that Defendants unlawfully terminated and failed to pay Plaintiff in violation of multiple state and federal wage protection, employment discrimination, and whistleblower protection laws. ECF No. 2. Presently pending before the Court are a Motion to Dismiss filed by Miller, ECF No. 21, a Motion to Dismiss filed jointly by UMD and Elkin, ECF No. 22, and Plaintiff's Motion to Amend his Complaint, ECF No. 24, to which only UMD and Elkin have replied, ECF No. 29. No hearing is necessary. Loc. R. 105.6 (D. Md. 2016). For the following reasons, the Motions are each granted, in part, and denied, in part. Plaintiff will be granted leave to amend certain claims while others will be dismissed.

1

I.  **BACKGROUND**

   A. **Factual Background**[1]

The Journal publishes academic scholarship and is a "nonpartisan, ideologically diverse, nonprofit organization whose goal is to promote serious and sustained inquiry into innovative institutional designs for a good society". ECF No. 26-1 ¶ 26. During the time period relevant to Plaintiff's Complaint, the Journal, an unregistered entity, operated by soliciting, receiving, and publishing article submissions, whereby the Editor-in-Chief and other Journal members determined which articles to publish, edited the articles, and sent the articles to Pennsylvania State University ("PSU") to create physical copies that could be distributed and sold to its customers. *Id.* ¶ 27. In support of the Journal's operations, UMD provided funding, office space on its main campus, telephones, technical support, and a ".umd" web address. *Id.* ¶¶ 3, 28, 29.

UMD professor Elkin founded the Journal, was the former Editor-in-Chief, and currently serves as Chairman of the Board of Directors. *Id.* ¶ 5. Plaintiff joined the Journal in 2000 as an editor, where he reviewed, edited, and proofread articles for the Journal for approximately 20-hours per week until December 15, 2015. ECF No. 26-1 ¶ 15. Plaintiff alleges that Elkin offered Plaintiff a position on the Journal if Plaintiff satisfactorily edited a sample article, stating "if you edit this article, I will pay you $10,000 a year" for the position. *Id.* ¶ 48. After editing the sample article, Elkin offered Plaintiff a position. Plaintiff accepted and hoped that, as an exile from Iran, the position would assist him in expanding his opportunities and allow him to obtain his PhD. *Id.* ¶ 50.[2]

Plaintiff alleges that, as Editor-in-Chief, Elkin "ran the Journal as he saw fit and with very little oversight." *Id.* ¶ 35. Elkin had authority to hire and fire personnel and decided which

---

[1] Unless otherwise noted, the facts are taken from the Amended Complaint, ECF No. 26-1, and assumed to be true.
[2] While Plaintiff initially sought admission to UMD to complete his PhD, Plaintiff could not afford to enroll. During his time with the Journal, Plaintiff was not enrolled as a student at UMD. ECF No. 26-1 ¶¶ 44-47.

employees to pay and how much to pay them. *Id.* ¶¶ 36, 37. Per Elkin's direction, some Editors served as University Research Assistants and were paid as UMD employees for their work on the Journal. *Id.* ¶ 40. Elkin controlled the Journal's bank accounts and paid himself with Journal funds. *Id.* ¶¶ 41, 43. However, the Journal did not maintain any books or records related to its funding and salary expenditures. *Id.* ¶ 42. After Elkin stepped down as Editor-in-Chief, he appointed Miller to the position, at which point Miller had control over the Journal's finances. *Id.* ¶ 39.[3] Plaintiff alleges that, as Editors-in-Chief, Elkin and Miller each executed a publishing agreement with PSU in 2011 and 2014, respectively, whereby each warranted that they had substantial control over the Journal and "full authority" to enter into the agreement. *Id.* ¶¶ 54, 55–60.

During his tenure with the Journal, Plaintiff received articles from Elkin or Miller and edited the articles in accordance with instructions provided by Elkin, Miller, or a managing editor. *Id.* ¶ 68. However, the Journal never paid Plaintiff a salary. *Id.* ¶ 4. Despite repeated requests, Elkin refused to pay Plaintiff, often responding that he would look into paying Plaintiff but never doing so. *Id.* ¶¶ 5, 86. However, Plaintiff alleges that the Journal and UMD paid other, less qualified, Journal Editors. *Id.* ¶ 87. Miller also refused to pay Plaintiff any salary during his tenure as Editor-in-chief. *Id.* ¶ 6. In 2014, Miller told Plaintiff that he expected to pay him $1,000 per month but, in December 2015, Miller stated that he would only pay Plaintiff $333.33 for one year of work. *Id.* ¶¶ 89, 90. Regardless, Plaintiff was never paid. *Id.* ¶ 91.

Plaintiff also alleges that during his time with the Journal, Elkin made a number of derogatory comments regarding Plaintiff's religion and national origin. *Id.* ¶ 5. For example, Elkin allegedly said to Plaintiff, "you are a Muslim are you? Why aren't you wearing a diaper on your head?" *Id.* ¶ 94. When Miller took over as Editor-in-Chief, he continued the harassment and

---

[3] Plaintiff does not allege that Miller is or ever was an employee of UMD.

3

discriminatory treatment through 2015. *Id.* ¶ 97. Plaintiff also alleges that Miller repeatedly told him he had "friends" close to the Iranian government, which Plaintiff contends was a threat against Plaintiff based on his national origin and activism against human rights violations in Iran. *Id.* ¶ 100. In meetings with Journal board member Professor Karol Soltan in October and November of 2015, Plaintiff relayed his concerns about his lack of pay, harassment, and failure to be promoted to a Senior Editorship in 2013. *Id.* ¶ 102.

During these meetings, Plaintiff also raised concerns that the Journal had committed fraud. *Id.* ¶ 103. Specifically, Plaintiff was concerned that the Journal was engaged in criminal conduct by "holding itself out as a non-profit while receiving money from the University" and selecting articles for publication to help other editors and authors advance in their careers rather than through a valid, peer-review process in contravention of academic and University standards. *Id.* ¶¶ 104, 105. Plaintiff contends that the Journal's failure to apply proper peer-review standards also breached the publication agreement it had with PSU, *id.* ¶ 106, and that the Journal illegally solicited money from the University without being a valid legal entity. *Id.* ¶ 110. After Plaintiff raised these concerns to Soltan, and Soltan relayed them to Elkin, Plaintiff contends that Elkin decided that Miller should leave the Journal, causing Miller to resign. *Id.* ¶¶ 103, 113. Miller also informed Plaintiff on December 15, 2015 that Plaintiff's position would be eliminated in 2017. *Id.* ¶ 114. The next day, despite having told Plaintiff that his job was to be eliminated, Miller suggested that they "formalize" Plaintiff's role with the Journal. *Id.* ¶ 117. However, Plaintiff ceased working for the Journal at that time. *Id.* ¶ 9.

### B. Procedural Background

After Plaintiff was informed that his position at the Journal would be eliminated, Plaintiff contacted the Maryland Commission on Civil Rights on June 9, 2016 and filed a charge of

discrimination on July 27, 2016. ECF No. 22-5. Thereafter, Plaintiff filed a Complaint in the Circuit Court for Prince George's County, Maryland, Case No. CAL-17-09725, on April 12, 2017. ECF No. 2. Elkin and UMD removed the action to this Court on November 11, 2017. ECF No. 1.[4]

On December 13, 2017, Defendants Miller, Elkin, and UMD filed Motions to Dismiss, or in the Alternative, for Summary Judgment. ECF Nos. 21 (Miller); 22 (Elkin and UMD). On January 31, 2018, Plaintiff filed a Motion to Amend his Complaint, ECF No. 24, and argued that the pending Amended Complaint rendered Defendants' Motions moot. ECF No. 27. In an attempt to cure the deficiencies raised by Defendants' initial Motions to Dismiss, Plaintiff expanded on the factual allegations for several claims, removed certain claims against UMD, clarified the legal justification for certain claims, and added claims under 42 U.S.C. § 1981 against Defendants Journal, Miller, and Elkin. *See* ECF No. 24-1. Defendants oppose Plaintiff's Motion to Amend, in part, on the grounds that the Amended Complaint does not cure the defects raised in Defendants' initial Motion and is therefore futile. ECF Nos. 28, 29.[5]

In his Amended Complaint, Plaintiff asserts the following claims: Unpaid Wages in Violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 200–218 against all Defendants (Count I); Violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code. Ann., Labor & Empl. §§ 3-501, *et seq.* against the Journal, Elkin, and Miller (Count II); Violation of the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann.,

---

[4] In its notice of removal, Defendants Elkin and UMD alleged that the Journal is an unincorporated association that had not been properly served. ECF No. 1. ¶¶ 11, 12. On the Certificate of Service, the removing Defendants served Katherine M. Allen, Associate General Counsel of PSU as counsel for the Journal. ECF No. 1. at 6. Because PSU published the Journal, PSU requested and received an extension of time to respond to the Complaint in order to determine the legal status of the Journal and whether PSU is a proper party defendant. ECF Nos. 18, 19. Thereafter, on January 15, 2018, Plaintiff voluntarily dismissed PSU without prejudice. ECF No. 23. At present, the remaining parties have not provided briefing to clarify the legal status of the Journal itself, and, unless otherwise noted, the Court's ruling herein only addresses claims brought against Defendants Elkin, Miller, and UMD.

[5] Only Defendants UMD and Elkin filed an opposition to Plaintiff's Motion to Amend. Defendant Miller has not filed any pleadings or motions since filing his Motion to Dismiss on December 13, 2017.

Labor & Empl. §§ 3-401, *et seq.* against the Journal, Elkin, and Miller (Count III); Harassment, Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2 against the Journal and UMD (Count IV); Violation of Maryland's Fair Employment Practices Act ("MFEPA"), Md. Ann. Code Art. §§ 20-601, *et seq.* against the Journal and UMD (Count V); Violation of Prince George's County Human Rights Act, Prince George's County Code § 2-185, *et seq.* and 42 U.S.C. § 1981 against the Journal, Elkin, and Miller (Count VI); and Retaliation in Violation the Maryland False Claims Act ("MFCA"), Md. Code Ann. State Fin. & Proc. § 11-301, *et seq*. against the Journal, Elkin, and Miller (Count VII).

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 15(a)(2), plaintiffs may amend their complaint with the court's leave, and "[t]he court should freely give leave when justice so requires." "[T]he general rule is that leave to amend a complaint under Federal Rule of Civil Procedure 15(a) should be freely given, unless the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008). Defendants' primary argument here is that the Amended Complaint is futile. "[T]he Court may deny as futile a motion to amend a complaint when the proposed complaint would not survive a motion to dismiss." *Dehaemers v. Wynne*, 522 F. Supp. 2d 240, 244 (D.D.C. 2007) (citing *James Madison, Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)); 3 Moore's Federal Practice § 15.15[3] (3d ed. 2000) ("An amendment is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss.")). Thus, in

determining whether Plaintiff's Amended Complaint is futile, the Court will analyze whether the challenged claims would survive a Motion to Dismiss.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief can be granted. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating the sufficiency of the Plaintiff's claims, the Court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). However, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "Naked assertion, devoid of further factual enhancement" is also insufficient to survive a motion to dismiss. *Id.*

## III. DISCUSSION

Plaintiff moved to amend his Complaint after Defendants Elkin, Miller, and UMD filed their first Motions to Dismiss and Plaintiff determined that PSU was not a proper party in this matter. Plaintiff's Amended Complaint seeks to revise his claims in response to the potential

deficiencies raised in the Motions to Dismiss and add newly-discovered factual information pertaining to the conduct of UMD, Elkin, and Miller. *See* ECF No. 24. Defendants do not argue, and the Court does not find, that Defendants would be prejudiced by the amendments or that the amendments are made in bad faith. Therefore, the Court will grant Plaintiff's Motion to Amend to the extent that the amendments are not futile. However, as discussed below, a number of Plaintiff's claims are futile and will be dismissed at this time.[6]

### A. Wage-and-hour claims (Counts I, II, III)

#### 1. FLSA Claim against UMD

Under the Eleventh Amendment, an individual citizen cannot directly sue a state absent a waiver by the State or congressional abrogation. *See* U.S. Const. amend. XI; *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). This immunity extends to "state agencies and state officers acting in their official capacity." *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 2011). UMD is an instrumentality of the State for the purposes of sovereign immunity. *See Magnetti v. Univ. of Md.*, 937 A.2d 219, 224 (Md. 2007) (citing Md. Code Ann. Educ. § 12-102(a)). "The Fair Labor Standards Act is Article I legislation and Congress lacks the power under Article I to abrogate states' sovereign immunity from suits in federal court." *McNamee v. Rectors & Visitors of the Univ. of Va.*, 2006 WL 3053264, at *3 (W.D.Va. Oct. 26, 2006) (citing *Alden v. Maine*, 527 U.S. 706 (1999). Absent congressional abrogation, individual states may waive sovereign immunity and consent to private suits under the FLSA. *See id.* (dismissing FLSA claim because the Commonwealth of Virginia provided no such waiver).

---

[6] Separately, Defendants urge the Court to deny Plaintiff's Motion because Plaintiff's failed to timely serve the initial Complaint in accordance with Federal Rule of Civil Procedure 4(m). ECF No. 29 at 15. However, Plaintiff filed his Complaint in state court, and the Court will not retroactively impose the Federal Rules to bar Plaintiff's Motion now.

Maryland has not provided a broad and absolute waiver of sovereign immunity for FLSA claims such that all FLSA claims are subject to judicial review. *See Maryland Military Dept. v. Cherry*, 854 A.2d 1200, 1203–1204 (Md. 2004) (citing *Robinson v. Bunch*, 788 A.2d 636 (Md. 2002)). Instead, Maryland's waiver is limited to the statutory remedies created by the Maryland legislature. *See Bunch*, 788 A.2d at 644 (holding that while the substantive provisions of the FLSA apply to State employees, the remedial provisions are governed by Maryland's statutory administrative and judicial review remedy for State employees). Pursuant to such remedies, State employees may file an administrative grievance as the "*exclusive remedy* for compensation disputes." *Id.* (emphasis added).[7]

Plaintiff does not dispute that Maryland's waiver of sovereign immunity for FLSA claims is limited to that provided by the Maryland legislature. Rather, Plaintiff argues that because UMD did not recognize him as an employee, he was unable to file an administrative grievance and, as a result, the Court should broadly apply Maryland's waiver of sovereign immunity to allow him to bring suit in federal court now. ECF No. 30 at 24. But the Maryland Court of Appeals consistently refuses to expand any limited waivers of sovereign immunity granted by the legislature, and this Court cannot do so now. *See Magnetti*, 937 A.2d at 229 (Md. 2007) ("this Court must read and construe legislative dilution of governmental immunity narrowly in order to avoid weakening the doctrine of sovereign immunity by judicial fiat.") (citation and internal quotation omitted).

---

[7] In *Robinson v. Bunch*, the Court of Appeals considered the administrative grievance procedure for employees in the State Personnel Management System. 788 A.2d 645–646 (Md. 2002) (citing Md. Code Ann., State Pers. & Pens. § 12-103). A similar grievance procedure for UMD employees is set forth in Md. Code Ann., Educ. § 13-203. Plaintiff has not argued that this distinction renders *Bunch* inapplicable. *See Coleman v. Calvert Cnty.*, No. GJH-15-920, 2016 WL 5335477, at *9 (D. Md. Sept. 22, 2016) ("The plaintiff bears the burden of showing an unequivocal waiver of sovereign immunity. (citing *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995))).

Alternatively, Plaintiff requests that the Court issue an order permitting him to file a claim through UMD's administrative grievance process. ECF No. 30 at 24.[8] However, Plaintiff does not allege he ever attempted to file a grievance and was denied. Nor does he provide authority for why the Court should order UMD to now permit such a filing as relief for his FLSA claim and the Court will not provide Plaintiff with a new avenue for relief outside of that already provided by the legislature. *See Cherry*, 854 A.2d at 1205 (holding that the administrative grievance procedure was the sole means by which former employees could obtain relief under the FLSA, even if the former employees were no longer able to file an administrative grievance at the time of suit). Therefore, Plaintiff's FLSA claim against UMD must be dismissed.[9]

### 2. Claims against Elkin and Miller

Defendants Elkin and Miller each contend that they were not employers and that Plaintiffs' wage and hour claims against them must fail on that basis. The FLSA, MWPCL, and MWHL all provide protections for an employee's earned wage, and Maryland courts generally apply the same four-factor "economic reality test" to determine whether a defendant is an "employer" and subject to liability under these statutes. *See Macsherry v. Sparrows Point, LLC*, No. ELH-15-22, 2017 WL 3315262, at *33–34 (D. Md. Aug. 3, 2017) (citing *Campusano v. Lusitano Const. LLC*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012) (MWPLC claims) and *Newell v. Runnels*, 967 A.2d 729, 772 (Md. 2009) (MWHL claims)). The pertinent considerations for the economic reality test are "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of

---

[8] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.
[9] Count I is also dismissed as to Elkin in his official capacity only. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State.").

10

employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Newell*, 967 A.2d at 772 (citation omitted).

The definition of "employer" is not limited to a corporate entity, and individual supervisors may be liable under these statutes. *See, e.g.,* MWPCL, § 3-501(b) (defining employer to include "any person who employs an individual in the State or a successor of the person"). While an individual supervisor is not necessarily an "employer," *see Watkins v. Brown*, 173 F. Supp. 2d 409, 415–16 (D. Md. 2001), he may be deemed an "employer" if he exercises sufficient control over that employee. *See Macsherry*, 2017 WL 3315262, at *35 ("Looking to the totality of the circumstances, the analysis turns on the economic realities of the individual's relationship with the putative employee."). In his amended complaint, Plaintiff has set forth allegations that Elkin ran the Journal as he saw fit and with very little oversight, ECF No. 26-1 ¶ 35; Elkin had authority to hire and fire personnel, *Id*. ¶ 37; Elkin determined the amount Plaintiff was supposed to be paid and provided his letter of appointment, *Id*. ¶ 48, 52; and that the editors-in-chief (which included Miller) had substantial control over Plaintiff's work, *Id*. ¶¶ 65-74. Additionally, Plaintiff alleges that after Elkin stepped down as Editor-in-Chief, he remained Chair of the Journal's Board of Directors and continued to provide direction. *Id*. ¶¶75-77. Therefore, Plaintiff has sufficiently pled that Miller and Elkin were his employers throughout the relevant time period.[10]

Plaintiff's wage and hour claims will survive against Miller and Elkin.

---

[10]Additionally, although not addressed in the Opposition to the Motion to Amend, Miller argues in his Motion to Dismiss that Plaintiff has conversely not sufficiently alleged that he was an employee. ECF No. 21-1 at 10-11. The Fourth Circuit has articulated a multi-factor test for determining whether a plaintiff should be classified as an employee, which, unsurprisingly, addresses similar factors as those that guide the analysis of whether the Defendants were the employers of the Plaintiff. *McFeeley v. Jackson Street Enterprises*, 825 F.3d 235 (4th Cir. 2016). For the same reasons articulated above, the Court finds that Plaintiff has sufficiently alleged that he was an employee.

### B. Employment Discrimination (Counts IV, V and VI)

#### 1. Hostile Work Environment

Plaintiff alleges that Elkin made discriminatory comments as early as 2000, yet waited fifteen years to bring federal and state hostile work environment claims. These claims are barred by the doctrine of laches and will be dismissed. In *AMTRAK v. Morgan*, the Supreme Court held that so as to "not leave employers defenseless against employees who bring hostile work environment claims that extend over long periods of time," a defendant "may raise a laches defense, which bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." 546 U.S. 101, 121 (2002).

Courts apply laches when there was a "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Id.* at 122. First, a lack of diligence exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (citing *National Wildlife Federation v. Buford*, 835 F.2d 305, 318 (D.C. Cir. 1987)). "An inexcusable or unreasonable delay may occur only after the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his cause of action." *Id.* Plaintiff argues that he did not diligently pursue his hostile work environment claim because his status as an Iranian refuge "caused him to be reluctant to engage in the judicial machinery." ECF No. 30 at 23. Nonetheless, Plaintiff knew of his claim as early as 2000 and made a conscious decision not to pursue it. Plaintiff has not provided any factual allegations to suggest that his delay in filing suit was reasonable; rather, the Complaint suggests that Plaintiff is bringing his claim now not because his immigration status no longer serves as an impediment to filing suit, but because he was terminated by the Journal. *See Knickman v. Prince George's Cnty.*, 187 F. Supp. 2d 559, 567 (D. Md. 2002) (finding plaintiff's six and a half year

delay in bringing suit "inexcusable and unreasonable" when plaintiff alleged she failed to bring suit because she was under medical care for depression and post-traumatic stress as a result of defendant's conduct).

Second, the prejudice prong is shown "by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct." *White*, 909 F.2d at 102. Defendants may prove prejudice based on inference, alone, and "the greater the delay, the less the prejudice required to show laches, and vice versa." *Id.* at 103. Because many of the interactions underlying Plaintiff's hostile work environment claims occurred over fifteen years ago, the Court finds that it would be difficult, if not impossible, for Defendants to raise a meaningful defense and identify witnesses or documentation necessary to refute Plaintiff's allegations.

Beyond Defendants' laches defense, Plaintiff's hostile work environment claims would likely also fail on the merits. To state a claim for hostile work environment, a plaintiff must plead that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 496 (4th Cir. 2015). Here, Plaintiff has only pleaded that he was subjected to sporadic derogatory comments over his fifteen years with the Journal, and does not allege that these comments had any appreciable impact on his performance. *See Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (hostile work environments depend upon "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance" (quoting *Harris*, 510 U.S. at 23)). Therefore, Plaintiff's hostile work environment claims will be dismissed.[11]

### 2. Disparate Treatment

While Plaintiff's hostile work environment claims may not proceed, his federal and state disparate treatment claims are still viable. Under Title VII, a plaintiff filing suit must first file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") or a state fair employment practices agency, generally within 180 days of the date of the alleged unlawful employment practice. *See Prelich v. Med. Resources. Inc.*, 813 F. Supp. 2d 654, 661 (D. Md. 2011). That limitations period is extended to 300 days in a "deferral state," *i.e.*, "one in which state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Id*. (citations and internal quotation marks omitted). As Maryland is a deferral state, Plaintiff was required to file a charge with the EEOC within 300 days of the alleged unlawful employment practice. *See id.* at 661–62; *see also Miller v. Kramon & Graham, P.A.*, No. GJH-15-1081, 2016 WL 4379229, at * 2 (D. Md. Aug. 16, 2016). The limitations period for MFEPA claims is two years. *See* Md. Code, State Gov. § 20-1013(a)(3).

Plaintiff filed his Charge of Discrimination with the Maryland Commission on Civil Rights and EEOC on July 22, 2016. ECF No. 22-5 (EEOC Charge). Therefore, statute of limitations bars Plaintiff's Title VII claim for any conduct occurring prior to September 26, 2015 and bars Plaintiff's MFEPA claim for any conduct occurring prior to July 22, 2014. UMD argues that it cannot be held liable for Plaintiff's disparate treatment claims because Elkin retired from UMD and stepped down as editor of the Journal in 2013. ECF No. 29 at 10. Thereafter, Miller assumed the day-to-day operations of the Journal and Miller, without UMD or Elkin, entered into

---

[11] Although the legal status of the Journal remains in dispute, Plaintiff's hostile work environment claims against the Journal will be dismissed for the same reason.

the publishing agreement in May 2014 with PSU on behalf of the Journal. *See* ECF No. 26-1 ¶¶ 59–61.[12]

However, even if Miller controlled the Journal at that time, Plaintiff's Amended Complaint introduces factual allegations to suggest that UMD was Plaintiff's joint employer at the time of his discharge in December 2015. Whether the University of Maryland can be held liable as a joint employer depends on a number of factors, including whether the University had the authority to hire and fire the individual, provided day-to-day supervision, and furnished equipment used at the place of work. *See Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 414 (4th Cir. 2015). Notably, the Journal remained on the first floor of Tydings Hall well after Plaintiff's discharge, the Journal listed its address as "3140 Tydings Hall University of Maryland" in 2014, a placard in Tydings Hall reflecting the Journal's presence remained as late as 2016, and Miller used a ".umd" email address and the Tydings Hall address for his work as Editor-in-Chief of the Journal. ECF No. 26-2 at ¶¶ 30–34. Therefore, Plaintiff's motion for leave to amend is not futile.

### C. Maryland False Claims Act (Count VII)

Plaintiff alleges he was terminated after "disclosing an activity, policy, or practice he reasonably believed to be fraudulent," ECF No. 26-1 ¶ 159, including that the Journal falsely held itself out as a non-profit while receiving money from UMD, failed to use a valid peer-review process in contravention of academic and University standards, and breached the publication agreement it had with PSU. ¶¶ 104–107.

---

[12] The May 2014 publishing agreement makes no reference to UMD and states that "This Agreement is made on 1 May 2014 between The Good Society, edited by Joshua Miller, George Washington University, Department of Philosophy . . . , and The Pennsylvania State University Press . . ." ECF No. 29-1. The Court may consider the 2014 Agreement as it is "integral to the complaint and authentic." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014).

Under the MFCA, a person may not, *inter alia*, "knowingly present or cause to be presented a false or fraudulent claim for payment or approval" to a governmental entity. *See* Md Code Ann. Gen. Prov. § 8-102(b)(1). The MFCA further prohibits a person from taking a retaliatory action against an employee that either "discloses or threatens to disclose to a supervisor or to a public body an activity, a policy, or a practice of the person that the employee, contractor, or grantee reasonably believes is in violation of § 8-102" or "objects to or refuses to participate in any activity, policy, or practice that the employee, contractor, or grantee reasonably believes is in violation of § 8-102." *Id.* §§ 8-107(a)(2), (a)(4).

The Court has not identified any federal or state courts addressing the MFCA in detail and will look to cases interpreting the analogous False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, for guidance.[13] Similar to the MFCA, the "cornerstone provision of the FCA prohibits any person from presenting 'a false or fraudulent claim for payment or approval' to the United States." *See Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 342–343 (4th Cir. 2010) (quoting 31 U.S.C. § 3729(a)). Furthermore, an employee cannot be discharged because of any lawful acts taken "to stop 1 or more violations of [the False Claims Act]." § 3730(h)(1). To survive a motion to dismiss a claim brought under § 3730(h)(1), an employee must allege that he took some protected activity under the FCA, *see Carlson v. DynCorp. International LLC*, 657 F. App'x 168, 170 (4th Cir. 2016) (citing *Eberhardt v. Integrated Designs & Const., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999)), and that the protected activity was motivated by an "objectively reasonable belief" that the employer was violating the FCA. *Id.* at 172.

Here, Plaintiff's Complaint does not suggest that he had an objectively reasonable belief that anyone from the Journal made any representation in support of a "false or fraudulent claim

---

[13] Judge Michael A. DiPietro of the Circuit Court of Baltimore City, Maryland briefly addressed the MFCA's "knowingly" requirement in short Trial Order. *See Maryland v. Soujourner-Douglass College, Inc.*, No. 24-C-16-005648, 2017 WL 4797637 (Cir. Ct. Balt. City, Apr. 24, 2017)

for payment or approval" to the State. Rather, Plaintiff's Complaint sets forth generic statements alleging that the Journal should not have held itself out as a non-profit and/or as a "peer-reviewed" publication. Plaintiff draws a conclusion that the Journal fraudulently accepted money from UMD without providing any supporting factual allegations. *See Mann*, 630 F.3d at 344 ("the protected activity element includes situations in which litigation could be filed legitimately and excludes those in which an employee fabricates a tale of fraud to extract concessions from the employer, or just imagines fraud but lacks proof") (citation and internal quotation omitted). Without referencing any specific claims made to, and accepted by, the State, Plaintiff cannot establish that he had an objectively reasonable belief that the Journal had violated the MFCA. Merely alleging that the Journal had lied to the State is insufficient. *See Carlson*, 657 F. App'x at 173 (dismissing FCA retaliation claim when employee alleged defendant was under-billing on a government contract because FCA is limited to fraud "that might result in financial loss to the Government" (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968))); *Layman v. MET Laboratories, Inc.*, No. RDB-11-03139, 2012 WL 4018033, at *5 (D. Md. Sept. 12, 2012) (noting that allegedly-fraudulent representations leading up to a submission to the government are not subject to the FCA because the "the plain meaning of the statute . . . states that someone must 'knowingly present to the government a false or fraudulent claim for payment or approval.'" (citing 31 U.S.C. § 3729(a)(1))). Therefore, Plaintiff's MFCA claim will be dismissed as to all Defendants.[14]

---

[14] Further undercutting Plaintiff's objectively reasonable belief is the fact that Plaintiff does not allege what, if any, false statements the Journal made after June 1, 2015—the date the MFCA became effective. *See* Md. False Claims Act, S.B. 0374, 435th Gen. Assembly, Reg. Sess. (Md. 2015) ("This Act shall be construed only prospectively and may not be applied or interpreted to have any effect on or any application to any claim made before [June 1, 2015]."). Plaintiff alleges that he was retaliated against in December of 2015, but does not allege that the Journal made any false claims or statements or received any State funding after June 1, 2015.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss, ECF Nos. 21, 22, shall be granted, in part, and denied, in part. Plaintiff's Motion to Amend, ECF No. 24, shall be granted, in part, and denied, in part. A separate Order follows.

Dated: September 27, 2018 /s/
GEORGE J. HAZEL
United States District Judge